**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID HELWIG, | ) | CASE NO. 1:20-cv-00920 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| CONCENTRIX CORPORATION, | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |
| | ) | |
| | ) | |

### I. Procedural History

On April 29, 2020, Plaintiff David Helwig, on behalf of himself and all others, filed a purported class action complaint against Defendant Concentrix Corporation, "a for-profit corporation employing over 100,000 people who work call centers throughout the United States and abroad, and from home." (R. 1, PageID# 1). The Complaint raises the following claim: (1) violation of 15 U.S.C. § 1681b(b)(3). *Id.*

On June 23, 2020, Defendant filed a motion to dismiss arguing that the Complaint failed to state a claim and for lack of subject matter jurisdiction. (R. 6). On March 26, 2021, the District Judge previously assigned to this matter denied the motion to dismiss. (R. 10). On April 9, 2021, Defendant filed its Answer. (R. 13). On February 22, 2022, this matter was reassigned to the undersigned District Judge. On March 14, 2023, Plaintiff filed a motion for class certification (R. 31), which Defendant opposed and moved to strike the class allegations from the Complaint. (R.

33). Plaintiff filed a reply brief in support of his motion for class certification. (R. 34). Plaintiff proposes the following class definition:

> All persons within the United States (including all territories and other political subdivisions of the United States): (a) who were the subject of a consumer report furnished to Concentrix from April 29, 2018 through the date of certification; and (b) against whom Concentrix took adverse employment action based in whole or in part on the consumer report without allowing a chance to address the report.

(R. 31, PageID# 185).

## II. Legal Standard

Federal Rule of Civil Procedure 23 ("Rule 23) governs federal class action lawsuits. Under Rule 23, a court may certify a class action if the party seeking class certification meets Rule 23(a)'s procedural requirements, *and* if certification is appropriate under Rule 23(b)(1), (b)(2), or (b)(3).[1]

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

***

---

[1] In the case at bar, Plaintiff asserts he satisfies Rule 23(b)(3)'s prerequisites. (R. 31, PageID# 190).

2

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

A party seeking class certification must affirmatively demonstrate his or her compliance with the Rule 23(a) and "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (emphasis in original).  "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id*. (internal citations omitted) ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim…. [as] the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.")

Even where a class meets the prerequisites of Rule 23(a), it must also pass at least one of the tests set forth in Rule 23(b). *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) ("No class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified, and each class meeting those prerequisites must also pass at least one of the tests set forth in Rule

23(b).")

A district court has "broad discretion to decide whether to certify a class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012).

### III. Summary of the Facts

**A. General Allegations**

Pursuant to the Fair Credit Reporting Act, "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates-- (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this subchapter .... " 15 U.S.C. § 1681b(b)(3)(A).[2] Plaintiff contends that both he and the putative class of job applicants were "not provided a meaningful opportunity to contest or explain the contents of their [background check] reports prior to suffering an adverse action." (R. 31, PageID# 183). In other words, it is alleged that despite receiving a pre-adverse action notice, Defendant had already made an adverse decision to not hire these applicants before the putative class had an opportunity to challenge the results of their background checks.[3]

It is Plaintiff's position that Concentrix's initial communications to applicants, whose reports contain negative information from a credit reporting agency (CRA), were essentially a final adverse action because there was no meaningful opportunity to respond before a job offer was withdrawn or revoked. (R. 31, PageID# 177, 181). The Court agrees with Defendant that

---

[2] The Court will refer to these requirements collectively as the "pre-adverse action notice."
[3] In a prior order, this Court observed that "[t]he statute gives Plaintiff the right to receive his report before Defendant made its adverse decision. Thus, a future right of Plaintiff is implicated. What he would have done with that report, or what he may do with it, is an issue for the merits and not relevant to Plaintiff's standing rights." (R. 10, PageID# 83).

Plaintiff's motion for class certification does not allege that Concentrix's applicants with potentially disqualifying information in their background checks were never sent a pre-adverse action notice. (*See generally* R. 31). Instead, the thrust of Plaintiff's complaint is that communications from Defendant's recruiters were essentially final adverse actions that failed to give applicants an opportunity to challenge any negative information in their background checks.

**B. The Background Check Process at Concentrix's Predecessors**

Defendant Concentrix is a for-profit corporation employing over 100,000 people who work call centers throughout the United States and abroad, and from home. (R. 1, ¶ 3). In October of 2018, Convergys Corporation merged with Concentrix to form the current iteration of Defendant Concentrix as it exists today. (R. 32-6 at PageID# 385, Deposition of Angela Goldsberry ("Goldsberry Depo.") at 18-19, 21).[4] Legacy Convergys and Legacy Concentrix, as well as the ensuing merged company, provided similar services with both companies using background checks that were performed by a CRA—either HireRight or Sterling—to screen applicants before they could begin training. *Id*. at 38, 44.

Before the 2018 merger, Legacy Convergys and Legacy Concentrix had "very similar" processes with respect to background checks, with the "big difference" being "who was doing the work." *Id*. at 36. At Legacy Concentrix, a team of one or two people "did all adjudication" concerning background checks while at Legacy Convergys "recruiters, or the delivery team, did the adjudication and was responsible for communicating back to the candidate." *Id*. at 36-37. These separate processes underwent a harmonization process that started in January of 2019 but

---

[4] When discussing either company prior to the merger, the Court will refer to them as "Legacy Convergys" and "Legacy Concentrix" respectively, while the merged entity will simply be referred to as Defendant or Concentrix.

was not completed until September of 2019. *Id*. at 37-38.

Prior to harmonization, at Legacy Convergys the background check was adjudicated by the recruiter, while at Legacy Concentrix adjudications were performed by Heather Block in Human Resources.[5] (R 32-6, Goldsberry Depo. at 36-37; R. 32-4 at PageID# 341, Deposition of Heather Block ("Block Depo.) at 19-20). Following the harmonization in 2019, adjudications were performed by Concentrix's recruiting teams (*i.e.* "talent acquisition"). (Block Depo. at 28-29).

In addition, before harmonization, Legacy Concentrix pre-adverse action letters were sent via U.S. mail. (R. 32-6, Goldsberry Depo. at 57).  The process at Legacy Convergys was to mail a pre-adverse action notice. *Id*. at 59, 104. In order to prevent applicants, who had failed their background checks, from needlessly showing up for scheduled training, Legacy Convergys's practice was to telephone such candidates. *Id*. at 104. Such candidates "were supposed to get a phone call from the recruiter to let them know not to go to training" in case they had not received their pre-adverse notice letter. (R. 32-6, Goldsberry Depo. at 62, 104). Legacy Convergys would make three attempts to reach these candidates by phone. *Id*. at 104-105. There was no back up plan or policy to contact said candidates via email. *Id*.

According to Angela Goldsberry, who had served as the Associate Director for Global Recruitment Practice with Defendant, she did not find any written policy that outlines what

---

[5] Defendants assert that "[w]hile some of the duties varied from time to time, the general recruiting role at Legacy Convergys, Legacy Concentrix, and at Concentrix today was and is essentially the same. Recruiters are responsible for reviewing applications, interviewing applicants, and determining whether an applicant is a good fit for a particular client." (R. 33, PageID# 532 at n. 1, *citing* R. 32-5 at PageID# 361-62, 364-65, Deposition of Tammy Villarruel ("Villarruel Depo.") at 11-13, 24-25). Recruiters would create rosters of candidates, who have accepted offer letters, for each training class and then track these candidates while the background check process was pending. (*Id*. at 31-37; R. 33-7 at PageID# 763-67, Deposition of Angela Mackay ("Mackay Depo.") at 19-24).

Legacy Concentrix recruiters were supposed to tell an applicant whose background check had contained negative information. (R. 32-6, Goldsberry Depo. at 65-66). Nevertheless, she indicated that she spoke to Legacy Concentrix recruiters to determine how these situations were handled and she testified that "there had to be some sort of training" because "they all said the same thing." *Id*. at 64. She testified that at Legacy Concentrix, recruiters would place calls and convey a message substantively similar to the one that follows:

> *The message was super generic*, and  they were not answering any questions, basically, that, you know, not to report to -- they wouldn't be able to report to training. The most elaborate response was that, you know, *we were still reviewing their background check*. In some instances they were all told to – that they would be getting something from either HireRight or Sterling, depending on who you talked to, and, if they had questions about the information, the dispute process was included in the communication they were getting. *It's very generic, to be honest, because a lot of people would be, like, why? And they were, like, call HireRight*.

(R. 32-6, Goldsberry Depo. at 65) (emphasis added).

Beginning in 2017, recruiters were given written instructions concerning the contents of their communications with applicants who failed their background check. (R. 32-4,  Block Depo. at 35, 44-45). Emails from Sue Foster, Senior Manager for North American Human Resources at Legacy Concentrix, gave guidance for Legacy Concentrix recruiters that included the following instructions for pre-adverse action notice situations:

> 9.  If the background is a *FAIL*, the recruiter contacts the candidates and informs them of the following:
>
> **"Unfortunately, you cannot start because your background has not yet fully cleared. However, based on the information already received, your background does not meet company requirements. A report will be sent to you from Hireright once the background fully completes. At that point you may reach out to HireRight to dispute any information you feel is inaccurate."**

(R. 33-2 at PageID# 554) (emphasis in original).

According to Angela Mackay, Associate Director of Talent Acquisition for Concentrix, there was a template email to send an applicant who had signed an offer letter but *failed to initiate* a background check. (R. 33-7, Mackay Depo. at 7, 36-37). However, applicants who failed the background check were supposed to be called. *Id*. at 37-38. A recruiter should only have emailed such an applicant if he or she could not reach said applicant by phone. *Id*. at 38. While Sue Foster's email contained the verbiage to be used, to Mackay's knowledge, no actual email template was created. *Id*. at 37-38. Mackay testified that an individual who challenges a background check's results remains "in consideration for a position." *Id*. at 39-40.

After the merger and harmonization of the Defendants' processes, Goldsberry testified that recruiters still call a failed applicant and that recruiters were trained as follows:

> And what I tell them is to contact the person, let them know that we've sent them a copy of their background and their FCRA summary of rights information and please review it. There's a concern with their background. We're going to need some additional time to review it. They can take a look at it in the interim. They won't be able to start training until we make a final decision.

(R. 32-6, Goldsberry Depo. at 76-77). Concentrix employed 120 recruiters in October of 2022, but the two Legacy companies had employed as many as 230 recruiters in aggregate before their merger. *Id*. at 27-29.

## C. Plaintiff Helwig's Experience

After Plaintiff applied for a position with Concentrix, he received an offer letter from Concentrix on February 13, 2020, which he accepted on the same day. (R. 32-3, PageID# 300, Deposition of David Helwig ("Helwig Depo.") at 37-38; R. 33-2, PageID# 555). Among other requirements, employment was contingent on Plaintiff successfully passing a background check. (R. 32-3, Helwig Depo. at 38;  R. 33-2, PageID# 555).

Helwig's hiring agreement also contained the following provision: "I further agree that I

will pursue any lawsuit relating to my employment with Concentrix (or any of its subsidiaries or related entities) as an individual, and will not lead, join, or serve as a member of a class or group of persons bringing such a lawsuit." (R. 33-2, PageID# 558).

Concentrix identified Plaintiff's background check as potentially disqualifying for the position because it included a conviction for aggravated trespassing. (R. 32-6, Goldsberry Depo. at pp 128-29). Plaintiff acknowledged having such a conviction at his deposition. (R. 32-3, Helwig Depo. at 45-46). After Concentrix received the potentially disqualifying information on Helwig's background report, on February 17, 2020, Plaintiff received an email with a link to a letter from Concentrix recruiter Shameka Jiles-Alvarez, which indicated that Concentrix was "considering revoking an employment offer." (R. 1, PageID# 3-4, ¶¶20-21). The letter informed Plaintiff as follows:

> You have a right to dispute the accuracy or completeness of any information Sterling Infosystems, Inc. dba Sterling Talent Solutions has provided, including the contents of the attached report, directly with Sterling. If you wish to file a dispute, please contact Sterling Infosystems, Inc. dba Sterling Talent Solutions immediately upon receipt of this letter and advise your HR representative at Concentrix Corporation that you have done so. If we do not hear from you within 5 days, we will make our hiring determination based on the information currently available to us.
>
> If you believe the information listed above is not accurate, please contact STERLING INFOSYSTEMS, INC within five business days of the receipt of this letter and advise your HR representative at Concentrix Corporation that you have done so. We will evaluate the information in your report on an individualized case-by-case basis in accordance with the law. If you believe that there is additional information that may help us better evaluate your fitness for this position, please contact us immediately.

(R. 1-1, PageID# 10-11, Exh. A).

The Complaint acknowledges that Helwig received the email with the link to the letter the same day, specifically on February 17, 2020 at 10:53 a.m. (R. 1, PageID# 3-4, ¶¶20-21). Later

that same day, on February 17, 2020 at 12:51 p.m., Jiles-Alvarez sent Helwig an email

containing the following statement:

> Hi David,
>
> At this time, you are no longer being considered for the Technical Support
> Advisor.
>
> Unfortunately, you cannot start in the scheduled training class because your
> background does not meet company requirements. A report will be sent to you
> from Sterling, you may reach out to them to dispute any information you feel is
> inaccurate.
>
> Sincerely,
> CONCENTRIX
> Shameka Jiles-Alvarez | Recruiter
> Work at Home Talent Acquisition

(R. 33-2 at PageID# 570, Concentrix Document 358).[6]

Days later, on February 24, 2020, Helwig received a final adverse action letter. (R. 32-3,

Helwig Depo. at 71).

It is Defendant's position that the February 17, 2020 email Plaintiff received from its

recruiter, Jiles-Alvarez, "was completely out of policy and procedure." (R. 32-6, PageID# 405,

Goldsberry Depo. at 101; *see also* R. 33-7, Mackay Depo. at 36-37 (indicating the template

email "should not have been" used for background checks)). Defendant's employees testified

that Jiles-Alvarez's email was based on a template email that was created and circulated by

Legacy Concentrix recruiter Tammy Villarruel in May 2017, prior to harmonization, for different

circumstances than a failed background check, such as the following situations: (1) a candidate

---

[6] Based on the statement "you are no longer being considered" for the position, Helwig
interpreted Jiles-Alvarez's email as telling him to "kick rocks." (R. 32-3, Helwig Depo. at 53-
54). Therefore, he did not dispute his background check because he construed the email as a
termination letter. (R. 32-3, Helwig Depo. at 53-54, 60).

who was identified as being not eligible for rehire ("NER") after the background check process was initiated; or (2) an applicant who, after the passage of time, failed to sign and return the forms necessary to initiate the background check after receiving an offer letter. (R. 32-6, Goldsberry Depo. at 95-96; R. 32-5, PageID# 368, Villarruel Depo. at 40). Goldsberry specifically testified that in Helwig's particular case, "it does not appear to me that [Jiles-Alvarez] followed the process. Based on just the timing of the information, I can't -- I don't think she called them." (R. 32-6, Goldsberry Depo. at 101, 111).

Nevertheless, Defendant's representative Goldsberry acknowledged in her deposition that fifty emails using the same template as the February 17, 2020 email sent by Jiles-Alvarez were sent to other applicants. (R. 32-6, PageID# 405, Goldsberry Depo. at 99). Documents produced in connection with the motions show at least two other examples of emails received by applicants that utilized the same "you are no longer being considered" language that was contained in the email Helwig received. (R. 33-2, PageID# 568-69).

Furthermore, contrary to Defendants' aforementioned policy of having recruiters telephone applicants who had potentially disqualifying information on their background checks, Helwig never received a telephone call—only the aforementioned email. He testified:

> Q:    Did anybody from Concentrix or Sterling call you about your background check?
>
> A:    No.
>
> Q:    Did you receive any messages, like voice mail messages or anything like that from anybody at Concentrix or Sterling?
>
> A:    No. I answer every call. If it's a voice mail, I return back. I even answer spam calls.

(R. 32-3, Helwig Depo. at 75).

Finally, when reviewing documents during her deposition, Goldsberry testified that 167 applicants who received a pre-adverse action notice from Defendant since April of 2019 had those notices cancelled and were ultimately hired by Defendant. (R. 32-6, PageID# 409, Goldsberry Depo. at 115-118).

### IV. Discussion

#### A. Class Waiver

Defendant's brief in opposition to certification contends that Helwig cannot adequately represent a proposed class due to the class waiver that Helwig signed during the application process. (R. 33, PageID# 547-48). As indicated above, the employment offer sent to Helwig, which he signed, contained the following provision: "I further agree that I will pursue any lawsuit relating to my employment with Concentrix (or any of its subsidiaries or related entities) as an individual, and will not lead, join, or serve as a member of a class or group of persons bringing such a lawsuit." (R. 33-2, PageID# 558). Because Helwig allegedly waived his right to lead or join a class, Defendant insists that Helwig is "naturally antagonistic to the proposed class." (R. 33, PageID# 548).

Plaintiff responds by asserting that such a class waiver, which is unaccompanied by an arbitration clause, is unenforceable in this Circuit. (R. 34, PageID# 810-811, *citing Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 592 (6th Cir. 2014) (holding that class-waivers in employment agreements did not preclude a collective FLSA action unless arbitration was part of the waiver provision)). The *Killion* decision was decided in the context of claims brought under the Fair Labor Standards Act (FLSA), pointing out that there was an "emerging consensus" that FLSA collective-action waivers were *enforceable* where said waivers contained arbitration provisions. 761 F.3d at 592. The *Killion* court, faced with a collective-action waiver that failed to

include an arbitration provision, found that the agreement did not validly waive employees' rights to participate in a collective FLSA action. *Id*.

Although the *Killion* decision did not speak to collective-action waivers outside of the FLSA context, other decisions relying on *Killion* have interpreted it more broadly. In *Abner v. Convergys Corporation*, 2019 WL 1573201, 2019 U.S. Dist. LEXIS 62597, at *5 (S.D. Ohio Apr. 11, 2019), a southern district of Ohio court, though addressing an FLSA claim, spoke more broadly: [w]ithin the Sixth Circuit, any collective or class waiver in an employment agreement without an arbitration provision is invalid." *See also Hall v. U.S. Cargo & Courier Serv., LLC*, 299 F.Supp.3d 888, 892 (S.D. Ohio 2018) ("class waivers without an arbitration provision are not valid.")). In *Hall*, the southern district court was also addressing an FLSA action, but found no merit in the defendant's argument that the inclusion of non-FLSA state law claims rendered the collective-action waiver valid. *Id*. at 893.

In any event, the Court agrees with Plaintiff that the plain language of the waiver states that it applies to "any lawsuit *relating to my employment* with Concentrix…." (R. 33-2, PageID# 558) (emphasis added). The Court finds merit in Plaintiff's argument that because Helwig and the other purported class members were never hired by Defendant Concentrix due to the negative information in their background checks, said individuals were *never actually employed* by Concentrix. Therefore, the waiver provision in the offer letter that precludes plaintiffs from participating in a class-action "lawsuit relating to my employment with Concentrix" is, by its own terms, inapplicable. The very essence of this action is the allegation that Defendants revoked an offer of employment—an adverse action—without first complying with FCRA requirements. *See Savedoff v. Access Grp.*, Inc., 524 F.3d 754, 763 (6th Cir. 2008) ("Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the

13

contract.") (citations omitted); *accord New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 521 (6th Cir. 2022).

In other words, the plain language of the waiver does not apply to the pre-employment cause of action asserted herein.

## B. Requirements of Rule 23(a)

The Court turns to a discussion of whether Plaintiff has satisfied all the requirements of Rule 23, starting with Rule 23(a). As stated above, Rule 23(a) sets forth the four prerequisites of class certification: (1) the class must be so numerous that "joinder of all members is impracticable"; (2) there must be "questions of law or fact common to the class"; (3) the claims of the representative party must be "typical" of those of the class; and (4) the representative party must "fairly and adequately protect the interests of the class."

### 1. Numerosity

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable," a requirement that does not involve a "strict numerical test" as a "substantial number" of affected individuals are sufficient to satisfy the requirement. *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 722 F.3d 838, 852 (6th Cir. 2013). While there is no magic number, "[a]s a general guideline, however, a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder, while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." *1 Newberg and Rubenstein on Class Actions* § 3:12 (6th ed.); *accord Kuchar v. Saber Healthcare Holdings LLC*, 340 F.R.D. 115, 120 (N.D. Ohio, 2021) (Gwin, J.); *Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 288 (N.D. Ohio 2007) (Zouhary, J.)

Plaintiff asserts that Concentrix cannot reasonably dispute numerosity, because the spreadsheet produced by Concentrix during discovery includes several thousand rejected applicants based on a consumer report. As explained below, the Court finds the appropriate class to be significantly smaller, but possibly as high as 50 individuals.[7] Therefore, the Court finds that the numerosity requirement is satisfied. In the event that further discovery significantly erodes the number of individuals who meet the class definition, joinder versus a class action may be more appropriate.

## 2. Commonality

Rule 23(a)(2) also requires "questions of law or fact common to the class." The purported class's claims must be based upon a "common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. (citations omitted); *accord Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015)

---

[7] "[D]istrict courts have broad discretion to modify class definitions, so the district court's multiple amendments merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed. *See, e.g. Schorsch v. Hewlett–Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) (noting that '[l]itigants and judges regularly modify class definitions'); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ('District courts are permitted to limit or modify class definitions to provide the necessary precision.')." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007); *accord Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 577 (M.D. Tenn. 2019), *order clarified*, 334 F.R.D. 118 (M.D. Tenn. 2019) ("A district court retains significant discretion to make modification decisions and its decision is reviewed for abuse of discretion.")

("named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case.").

Commonality is not entirely satisfied here for the class proposed by Plaintiff. The common question of law and fact presented is whether all applicants who had negative information in their background checks had an adverse action taken against them *without* being afforded an opportunity to challenge potentially disqualifying information therein. Where there is commonality, the determination of the truth or falsity of this question would resolve the central issue necessary to determine each claim in one stroke. However, the answer to the central question presented herein does not appear to be "yes" to all or "no" to all, but rather "depends."

First, as set forth in the facts section above, the answer to the common question depends on whether the applicant received a *telephone* call, which appears to have been the standard practice of Defendant, or whether the applicant was one of the rather small group of fifty individuals who received an email. Helwig belongs to this smaller group.[8] (*See, e.g.,* R. 32-6, Goldsberry Depo. at 62, 104). While Plaintiff contends the form of the communication—email or telephone call— is immaterial, the Court does not agree. There is evidence suggesting that the content in the fifty emails were nearly identical (despite the act of sending these emails being contrary to the company's routine practice).[9] (R. 33-7, Mackay Depo. at 36-37) (indicating the template email

---

[8] As stated above, the requisite "rigorous analysis" that this court must engage in "will entail some overlap with the merits of the plaintiff's underlying claim…. [as] the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 350–51.

[9] As recounted above, documents show at least two other examples among the fifty emails received by the applicant utilized the same "you are no longer being considered" language that was contained in the email Helwig received. (R. 33-2, PageID# 568-69).

"should not have been" used for background checks).

Conversely, the telephone calls that recruiters placed to applicants were supposed to follow a routine script and convey the generic message that applicants should not report to training because Concentrix was still reviewing their background check, or that they would be receiving a letter from either HireRight or Sterling with additional information about the dispute process. (R. 32-6, Goldsberry Depo. at 65). Nothing in the evidence presented either in support or against certification suggests that Defendant's employees were instructed to communicate anything resembling the "you are no longer being considered" language in their telephone calls.[10] As such, despite the discovery to date, Plaintiff's theory that recruiters who placed telephone calls to applicants communicated a final, adverse action to applicants during these calls remains conjecture.[11] Further, there is evidence that applicants who challenged a background check's results remained "in consideration for a position." (R. 33-7, Mackay Depo. at 39-40). This is buttressed by testimony that 167 applicants who received a pre-adverse action notice from Defendant since April of 2019 had those notices cancelled and were ultimately hired by Defendant. (R. 32-6, PageID# 409, Goldsberry Depo. at 115-118). Proof would vary from each individual applicant as to the substance of the telephone call received from as many as 200 different recruiters. Therefore, the common question in this lawsuit does not appear to be capable

---

[10] "The FCRA is not violated until an adverse employment decision 'is communicated or actually takes effect, and an [employer] has until that time to take the necessary steps to comply with the FCRA's requirements.'" *Cox v. TeleTech@Home, Inc.*, No. 1:14-CV-00993, 2015 WL 500593, at *4 (N.D. Ohio Feb. 5, 2015) (Gwin, J.) (*citing Burghy v. Dayton Racquet Club, Inc.*, 695 F.Supp.2d 689, 703 (S.D. Ohio 2010); *Obabueki v. Int'l Bus. Machines Corp.*, 145 F. Supp. 2d 371, 392 (S.D.N.Y. 2001), *aff'd*, 319 F.3d 87 (2d Cir. 2003); *In re Farmers Ins. Co., Inc. FCRA Litig.*, No. CIV–03–158–F, MDL No. 1564, 2007 WL 4215833 (W.D. Okla. Nov. 29, 2007)).
[11] To the extent it is Plaintiff's theory that a delay in training while the background check process is completed amounts to an adverse action, the Court is unconvinced by such a novel theory.

of a common, uniform answer with respect to the proposed class, as it depends upon whether an applicant received a telephone call or the much less common email.[12]

Even if the Court were to consider, for the sake of argument only, that the issue of whether an applicant received a telephone call versus an email was immaterial, the answer to the common question in this litigation would vary greatly depending on what was communicated to the applicants and how those communications were interpreted. The generic language that Defendant's employees were instructed to use does *not* appear to convey the message that a final, adverse action had been taken. It is possible that Defendant's recruiters deviated from the standard practice when making those calls. However, the possibility that Defendant's recruiters went off script only adds new layers of dissimilarity, and takes the analysis even further from a common answer to the common question in this case. In *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998), the Court of Appeals found that the defendant's statements to a purported class of early retirees were not uniform because the statements varied significantly, depended on the person making the representation, and that this myriad of communications was still subject to subjective understandings of the representations. The *Sprague* court concluded that "[g]iven the wide variety of representations made, there must have been variations in the early retirees' subjective understandings of the representations and in their reliance on them….

---

[12] Plaintiff's reply asserts that "[t]he evidence here does not show that Mr. Helwig and the other class members were told materially different things when it came to removing them from training and communicating that their background check did not meet company standards." (R. 34, PageID# 807). Plaintiff's contention does not stand up to scrutiny. There is no indication that anything resembling the rather stark "you are no longer being considered" language was communicated in the phone calls. Without deciding the matter as a matter of law, the language utilized in Plaintiff's email is strongly suggestive of a final, adverse decision. By contrast, the generic language Defendants recruiters were trained to use does not convey a similar message. The fact that both sets of applicants were instructed not to attend training render at this time does not render the other information contained in the respective messages similar.

Given these myriad variations, it seems to us that the plaintiffs' claims clearly lacked commonality." *Id*. at 389.

Here too, the Court finds commonality lacking with respect to the class Plaintiff seeks to certify. The message conveyed by each recruiter in their respective calls could have varied from other recruiters. Notably, Defendant employed between 120 and 200 recruiters. In fact, recruiters who ignored the general script may have had significant variation in each and every call they made. Compounding the dissimilarities, of course, is the additional variable that applicants may have interpreted the message differently. The wide array of possible messages conveyed and received during these phone calls results in a lack of commonality, and maintaining a class action under these circumstances would be inefficient and unworkable.

However, the Court finds that commonality does exist with a much smaller class, the approximately fifty individuals who received substantially similar emails as Helwig. Although, Defendant points out that two such individuals were ultimately hired, notwithstanding the "you are no longer being considered" language (R. 33, PageID# 542), the Court finds that two exceptions do not defeat commonality. The certified class can certainly be constricted further if additional discovery reveals that the fifty emails contained substantive differences in their message.

### 3. Typicality

Plaintiff also must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). According to the Sixth Circuit Court of Appeals, "[a] claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007)

(*quoting In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)). In other words, "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399 ("typicality requirement is not satisfied when a plaintiff can prove his own claim but not "necessarily have proved anybody's else's claim.") .

Because commonality of the proposed class is lacking, the Court declines to offer a full analysis of whether typicality exists with respect to the class proposed by Plaintiff. However, the typicality requirement here is not satisfied because Plaintiff could theoretically prove his claim but not thereby prove any of the claims of the vast majority of the applicants who received telephone calls. Nevertheless, Plaintiff's claims are typical of the approximately fifty individuals who received emails like Helwig.

### 4. Adequacy

The fourth prerequisite under Rule 23 requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This involves two requirements: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (citations omitted); *accord Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012).

Because commonality and typicality of Plaintiff's proposed class is lacking, the Court declines to address this prerequisite in the interests of judicial economy. With respect to the fifty similarly situated who received an email like Helwig, the Court finds Helwig shared common interests with unnamed members of the class in that they received similar, if not identical, emails that can be construed as an adverse action without receiving a pre-adverse action notice first or

being afforded an opportunity to challenge the results of their background checks. The Court has

no reason to believe that Plaintiff will not vigorously prosecute the interests of the class through

qualified class counsel, as Plaintiff's counsel has competently litigated the case up to this point.

Defendant has not meaningfully challenged the adequacy requirement, save for the above

rejected argument that Plaintiff would not be an adequate representative due to the class-action

waiver. (R. 33, PageID# 547-548).

### 5. Rule 23(b)(3) Requirements

Plaintiff acknowledges that in addition to meeting the four requirements of Rule 23(a),

parties seeking class certification must demonstrate that the action is maintainable under one of

the three subsections of Rule 23(b). (R. 31, PageID# 190). Plaintiff asserts that both the

predominance and superiority prongs are both satisfied. *Id*. at PageID# 190-193. Defendant

concedes that a class action may be maintained if "any one of three conditions set forth in Rule

23(b)" are satisfied, but disagrees that any of the three are satisfied. (R. 33 at PageID# 548-49).

Plaintiff invokes the third category, which requires showing the following: (1) common

questions of law or fact "predominate" over any questions affecting only individual members,

and (2) "a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"To meet the predominance requirement, a plaintiff must establish that issues subject

to generalized proof and applicable to the class as a whole predominate over those issues

that are subject to only individualized proof." *Young*, 693 F.3d at 544 (*quoting Randleman v.

Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352-53 (6th Cir. 2011)). Limiting the consideration to the

approximately fifty individuals who received emails like Helwig, the Court finds their claims

would be subject to generalized proof rather than individualized proof.[13] Defendant's contention that different applicants would interpret the "no longer being considered" language differently is not well taken. While Defendant indicates two individuals were hired despite receiving such emails, two possible exceptions does not mean that individual questions will predominate.

Plaintiff has also shown that a reduced class of fifty is a superior method for resolving the FCRA claims. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Young*, 693 F.3d at 545 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997)). Further, cases that allege "a single course of wrongful conduct are particularly well-suited to class certification." *Id.* (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007)). Here, it is alleged that Defendant sent a number of emails that contained the "no longer being considered" language, which allegedly violated the FCRA. Such a single course of action is quite amenable to class action.

In summary, Plaintiff's request to have a class certified is denied in part and granted in part. Instead, the Court certifies a more limited class. The Court's modification is reflected in bold:

> All persons within the United States (including all territories and other political subdivisions of the United States): (a) who were the subject of a consumer report furnished to Concentrix from April 29, 2018 through the date of certification; **(b) who received an email or letter from Concentrix containing the "no longer being considered" language (or a substantively close approximation thereof);** and (**c**) against whom Concentrix took adverse employment action based in whole or in part on the consumer report without allowing a chance to address the report.

---

[13] Although Plaintiff seeks to certify a class including applicants who received telephone calls, such a class would fail the predominance test. As found *supra*, individual questions would dominate, such as which recruiter made the telephone call, did the recruiter follow the generic script for such calls, if not how did the content of the communications differ, and how did the applicants subjectively understand these differing calls.

Because the Court finds it appropriate to certify a class, Defendant's Motion to Strike Class Allegations (R. 33) is DENIED.

### V. Conclusion

For the foregoing reasons, Plaintiff's Motion to Certify a Rule 23 Class Action (R. 31) is hereby GRANTED in part and DENIED in part. Defendant's Motion to Strike Class Allegations (R. 33) is DENIED.

   IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States District  Judge

Date: March 20, 2024